RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0084p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

CURTIS WHEAT,

                    *Plaintiff-Appellant,*

v.

FIFTH THIRD BANK,

                    *Defendant-Appellee.*

No. 13-4199

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:11-cv-00737—Susan J. Dlott, District Judge.

Argued:  November 21, 2014

Decided and Filed:  May 7, 2015

Before:  DAUGHTREY, MOORE, and CLAY, Circuit Judges.

---

#### COUNSEL

---

**ARGUED:**  Sandra J. Fortson, Brandywine, Maryland, for Appellant.  Donyetta D. Bailey, RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Sandra J. Fortson, Brandywine, Maryland, for Appellant.  Donyetta D. Bailey, RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, for Appellee.

---

#### OPINION

---

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Following a workplace altercation between plaintiff Curtis Wheat and one of Wheat's co-workers, defendant Fifth Third Bank terminated Wheat's employment at the financial institution.  Wheat then filed this lawsuit, asserting that his termination was motivated by racial animus, in violation of both Title VII of

1

the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17, and the Ohio Civil Rights Act, Ohio Rev. Stat. § 4112.02(A). After a period of discovery, the bank filed a motion for summary judgment and, based on a report and recommendation submitted by a magistrate judge, the district court granted the motion and entered judgment for the bank. In doing so, the district court held that Wheat had failed to establish a necessary element of his *prima facie* case and that, in any event, he could not show that the bank's asserted rationales for its employment decision were a pretext for invidious discrimination. On appeal, Wheat challenges both determinations. For the reasons discussed below, we conclude that Wheat has met his less-than-onerous burden of establishing a *prima facie* case of racial discrimination and that he has identified genuine disputes of material fact that preclude a finding that the bank's stated reasons for firing Wheat were not pretextual. We therefore reverse the judgment of the district court and remand this matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Curtis Wheat, an African-American male, began working at the Madisonville (Ohio) branch of Fifth Third Bank as a sorter operator in 2001. By 2010, his job description had changed to that of a payment processor in the wholesale-lockbox department of the bank, although beginning in August 2009, Wheat also functioned as an "auditor" who "double-check[ed] [other] payment processor[s'] work."

On Friday, February 19, 2010, Wheat was scheduled to report to work for the second shift at 3:00 p.m. As was his custom, he arrived at work early, "[p]robably 10 til," and stopped at the mail-packaging desk to speak with Lateascha (Tish) McNear before he clocked in. According to his deposition testimony, Wheat then observed Brad Hatfield, a Caucasian male payment processor, fumbling with his tray of work and grimacing. Wheat was responsible for checking Hatfield's work, and when he noticed Hatfield's apparent frustration, he presumed that Hatfield was upset with Wheat's audit of what Hatfield had done. Wheat asked Hatfield whether there was a problem, and Hatfield responded, "What do you mean is there a problem?" At that point, Wheat retorted, "[Y]ou don't answer a question with a question," and, according to Wheat's testimony, "it just took off from there," with Hatfield claiming, seemingly

incongruously, that he was not afraid of Wheat. Wheat then left the area, clocked in for work, and proceeded to his desk.

Other witnesses to the verbal exchange offered similar accounts. Sami Badawi, the lead for the wholesale-lockbox payment processors, related that "Curtis asked, 'What is your problem,' to Brad. And Brad said, 'I don't have a problem.' And everybody go to his desk." Hatfield's deposition testimony provided a more detailed recitation of the encounter between Wheat and him but still confirmed that the interaction ended without serious incident:

> I was pitching my mail. And I believe it was 3:00. Around that time. Curtis walked in and began talking to a mailroom lady. I believe her name was [Tish]. I don't know what they were talking about, but he asked me if I had a problem. I was – I looked at him very stunned and shocked and said, "What?" And he said, "You heard me. Do you have a problem? I said, "What" probably three or four times. And then I said, "No."

> And then he walked – he left [Tish] and he was going back to his desk. At that point he would have met me more face on. And he said, "Do you have a problem?" And I said, "No. Do you have a problem? The fact that you are asking me this implies to me that you have a problem. Do you have a problem?" And then he said, "Don't answer me – don't answer my question with a question. Do you have a problem?" And I said, "If you are trying to scare me, it's not working." He said, "Do you want to bet?" I said, "What's that supposed to mean?" He said, "Do you want to bet, because I'm a betting man." At that point I don't know if he walked away or if I walked away, but he returned to his desk and I finished pitching the mail.

Had that been the extent of the interaction between Wheat and Hatfield that afternoon, the parties would not be embroiled in this litigation. Unfortunately, shortly after Wheat returned to his desk, Badawi observed, "Brad come back to Curtis, to his desk." Wheat claimed that Hatfield continued to ask whether he had a problem, to which the Wheat replied, "I didn't know I had a problem." When Hatfield then asked Wheat if he was "PMSing," Wheat claimed that he responded, "I didn't know I was a female." At that point, Hatfield "started getting loud. So [Wheat] remember[ed] another individual said we should take it outside, off the floor. So [Wheat] was like, 'Would you like to go outside so we don't get other employees involved?'"

Wheat recounted the ensuing events as follows during his deposition testimony:

> Well, we got out [into the hallway], and he was like, "Dude, what is your problem?" And I told him, "I didn't know I had a problem." And I was like,

"Now, we're out here.  You should ask – we should try to figure out what is the problem."  And we was just going back and forth.  And he was like – he made a threat that I didn't know what he was capable of doing, and he – I told him, "You're right.  I don't know what you are capable of doing."  And that's when [supervisor Jason] Curfiss came out.  Well, Mr. Curfiss was basically out there when we got out into the hallway.  So Mr. Curfiss witnessed the whole event.  So we was sitting there exchanging words.  Then I was about to turn around and that's when he assaulted me . . . .  [Hatfield] like, took a – I don't know if it was a punch or a swipe, but he touched me . . . .  He, like, swatted me.  Like, hit my arm . . . .  I was ready to turn around and leave and that's when he hit me like I was going to do something to him.

Rather than retaliate physically, Wheat claimed, "I called him a little bitch. . . .  Multiple times."

Hatfield admitted that he was indeed responsible for prolonging the initial confrontation between the two men.  He also corroborated much of Wheat's account of the ensuing exchange, claiming:

When I went back to my desk I was not comfortable with the conversation.  I went back to Curtis'[s] desk, stood a cubicle back, and said, "Are you going to tell me what that was all about, or should I chalk this up to your period?"  He said, "Yeah, chalk it up to my period."  And then he said, "You are the one acting like a girl."  And I said, "Do you want to go to the conference room and talk this out like men?"  And he said, "Sure.  Let's go to the conference room."

We proceeded up the aisle.  He was very close on my back.  I stopped and said, "Go ahead."  He said, "No.  You go ahead."  So I walked on.  When we got out into the hallway, we did not make it to the conference room.  My back was catty-cornered against the wall, he was in my face, and he started calling me a little bitch.  "You are a bitch" – no, "little bitch."

At that time I believe Jason Curfiss came out.  He asked us to separate and we both were not separating.  He said, "We can clock out right now."  I said, "You are not capable" – I said, "You don't know what I am capable of doing."  And he said, "Let's clock out right now."  And I said, "I've got a wife and kid.  You are not worth it."  And then he continued to call me a little bitch.  And I said, "Jason, he can't sit here and keep calling me a bitch."  And Curtis said, "I'm not calling you a bitch.  I am calling you a little bitch."  And then he put his hand in my face and I swatted it out and said, "Don't you touch me."  And at that time Jason was able to separate us.

After separating Wheat and Hatfield, Curfiss enlisted the aid of his supervisor, Susan Lohstroh, as well as that of Michelle "Mia" Healy, Fifth Third's employee relations consultant.  Those three individuals then met first with plaintiff Wheat in the bank's conference room in an

effort to understand what had occurred during the confrontation with Hatfield. Healy took charge of the meeting and "was the main person conducting the investigation."

According to Wheat, most of the questions propounded by Healy were "irrelevant to the incident" and were based on assumptions made after hearing only Curfiss's recounting of the confrontation. Discussing the meeting in his deposition, the plaintiff admitted to "being rude, because [he] was talking over [the] top of [Healy]." Moreover, he testified that he chose not to respond to the irrelevant questions and got frustrated because Healy never allowed him to tell his side of the story. In the end, Wheat became so exasperated that he threw his employee-identification badge on the conference table. When asked whether he intended the act to signify his resignation from the bank, however, he retrieved his badge, believing that there was no reason to resign because he did not believe he had done anything wrong. In fact, when asked by Susan Lohstroh, "If [you] had to do it all over again, would [you]?" he responded, "Yes. Yes, I would."

Healy had a slightly different recollection of the questioning. Although she concurred that Wheat was loud, rude, and disruptive, she contended that it was he, not she, who would ask "questions that were irrelevant to this situation." Healy also recalled that Wheat stated, "I'll take care of it myself" and "Monday is going to be a big day," but when asked what he meant by those statements, Wheat would not respond.[1] Eventually, Healy directed the plaintiff to clock out and go home and not report back to work until further investigations had been completed.

When Wheat's interrogators finished questioning him, they summoned Hatfield to the conference room and asked him to offer his account of the altercation with Wheat. Although he did so in a calm, cooperative manner, Hatfield also informed Healy, Lohstroh, and Curfiss, "I think me and Curtis both have had a bad day. I don't want any problems with him with my job." In accordance with company policy, Hatfield was also sent home for the remainder of the day, but in contrast to Wheat, Hatfield was told he could report to work on Monday. Healy later claimed that Wheat had been told to await permission to return to work because of the threat of

---

[1]Although Healy understood Wheat's comment about Monday being a big day to be a veiled threat of violence, Curfiss testified during his deposition that the plaintiff had told him on a few occasions "that he had his own documentation about how the department was run, he had been taking notes for a long time, had been saving it up for the right opportunity. . . . When I heard that, that's what I thought Monday was about."

workplace violence he posed, whereas Hatfield could report to work the following Monday because he did not pose a similar threat to anyone in the department.

On that following Monday, February 22, Healy telephoned Wheat at his home and informed him that his employment with the bank had been terminated because "he had violated [the bank's] workplace violence policy, that he had made a threat of physical violence, that he also violated [the bank's] anti-harassment policy and that he was in violation of [the bank's] core values." Hatfield, on the other hand, was allowed to return to work and was given only a written disciplinary action, having been deemed a "nonaggressor." In fact, Curfiss telephoned Hatfield at home to say, "You are absolutely fine. You are not fired. Curtis has been fired, and it has been a long time coming." Moreover, the next day, Curfiss provided Hatfield with a "write-up" "that stated [Hatfield] did nothing wrong and the next time just go straight to management."

On March 30, 2010, approximately one month after his termination from Fifth Third, Wheat filed with the Ohio Civil Rights Commission a charge of discrimination. In that charge, the plaintiff asserted that he had been discriminated against on account of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended. The allegation was investigated by the United States Equal Employment Opportunity Commission (EEOC), which "found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for [the plaintiff]." Based on its findings, the EEOC issued Wheat a notice of his right to sue in federal district court.

Upon receipt of Wheat's administrative charge of racial discrimination, Healy conferred with the bank's in-house legal counsel and "ma[d]e the decision to take a second look at the case." In doing so, she spoke with other bank employees and re-interviewed Hatfield. According to Hatfield's deposition testimony, during that second interview, he told Healy "the exact same story that [he] told all of them" at the first interview on February 19. In fact, he specifically claimed in his deposition that during his first interview with Healy, Lohstroh, and Curfiss, he told Healy that he had swatted Wheat's hand away and that "[he] and Curtis had actually separated and then that [Hatfield was] the one that reinitiated the conversation at [Wheat's] cubicle."

Nevertheless, despite Hatfield's claim that his two recountings of the events of February 19 were identical, Healy insisted that at the second interview, "Brad revealed further information that he did not share in the first investigation." Specifically, Healy claimed:

> Brad told me that he was the one that went – him and Curtis had an initial confrontation, verbal confrontation. They parted ways. Brad went to the vending area, got a soda. He came back into the work area, saw Curtis chatting with some coworkers. He went up to Curtis and asked Curtis – asked Curtis, you know, it seems – said something to the effect that it seems to me you keep asking me if I have a problem with you. I seem to think you have a problem with me. The conversation ensued from there. Had Brad not done that, you know, that confrontation may have never happened.

At the conclusion of the second investigation into Hatfield's role in the events of February 19, Healy made the decision on May 14, 2010, to fire Hatfield as well. According to Healy's deposition testimony, that decision was reached after "understanding Brad's full involvement and the fact that Brad was not forthcoming and that he lied about his involvement, he too was an aggressor."[2]

Having received his right-to-sue letter from the EEOC, Wheat filed suit against the bank in federal district court and alleged that his employment had been terminated on account of his race, in violation of the anti-discrimination provisions of Title VII and of the Ohio Civil Rights Act. The defendant bank eventually moved for summary judgment in its favor, and that motion was referred to a magistrate judge for initial evaluation. In a lengthy report and recommendation, the magistrate judge concluded that Wheat failed to establish all elements of his *prima facie* case because he could not establish that he was similarly situated to Hatfield, an individual outside the protected class who was alleged to have been treated more favorably by the defendant. Even if the plaintiff had made out his *prima facie* case, the magistrate judge concluded, summary judgment in favor of the defendant still would be proper because Wheat was unable to show that the legitimate, nondiscriminatory reasons offered by the bank for the plaintiff's termination were a pretext for forbidden discrimination. Wheat filed objections to the magistrate judge's report, placing the matter before the district judge. After reviewing the record

---

[2]Interestingly, after learning of his termination from the bank, Hatfield also filed a charge with the EEOC based upon his belief that he "was fired just to cover Curtis'[s] law – lawsuit." That charge was dismissed, however, as the bank convinced the EEOC that Hatfield's termination "wasn't about race. [It] was about inappropriate behavior."

and the magistrate judge's recommendation, the district court adopted the report and recommendation and granted the defendant's motion for summary judgment. From that ruling, the plaintiff now appeals.

## DISCUSSION

**Standard of Review**

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

**Title VII Claim[3]**

Title VII provides that an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). In order to establish a claim under Title VII, a plaintiff must present either direct or circumstantial evidence of discrimination on the part of the employer. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) (citation omitted). Because Wheat offers no direct evidence of racial discrimination on the part of Fifth Third Bank, he relies instead upon the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that paradigm, a plaintiff first must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff does so, the

---

[3]Claims brought pursuant to the Ohio Civil Rights Act are evaluated under the same framework as are claims brought under Title VII. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003). We will treat both Wheat's state-law claim and his federal claim together.

burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse action.]" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The plaintiff then is required to prove that the reasons proffered by the defendant were not its true reasons, but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

### *Prima Facie* **Case**

In order to establish a *prima facie* case of race discrimination, a plaintiff must show that:

> 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (footnote and citation omitted). We have held consistently that a plaintiff's burden of establishing a *prima facie* case is not an onerous one, *see, e.g.*, *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 253), and is "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (citations omitted).

In this appeal, the bank does not contest that Wheat, an African-American, was a member of a protected class, that he was qualified to serve as a payment processor, and that his termination from that position constituted an adverse employment action. Taking its cue from the report and recommendation of the magistrate judge, however, the defendant insists that Wheat is unable to establish a *prima facie* case of discrimination because he cannot point to another similarly situated individual in the employ of the bank who was treated more favorably than he was.

In response to Wheat's assertion that he and Brad Hatfield were similarly situated but nevertheless were subject to different treatment, the defendant offers three arguments. First, the bank contends that Wheat and Hatfield actually had different jobs at the bank—Hatfield was a payment processor, and Wheat was an auditor who was charged with the responsibility of checking the work of processors like Hatfield. Second, the defendant insists that Wheat and

Hatfield were not true comparators because Wheat was the clear aggressor in the confrontation and Hatfield merely responded to the provocation. Third, the bank argues that the plaintiff and Hatfield were not similarly situated employees because Wheat displayed aggression and rudeness during his post-altercation interview with Mia Healy, while Hatfield was polite and accommodating when he was interrogated.

When the evidence is viewed in the light most favorable to the non-moving party, however, the dissimilarity between the positions of the two men is not apparent. Despite evidence that Wheat devoted much of his work time to auditing functions prior to his discharge, the record also is clear that Jason Curfiss, Wheat's immediate supervisor, described the plaintiff's actual job title as "payment processor"—the same as Hatfield's—not auditor. Furthermore, Wheat himself said that although he "was performing the auditor's job functions," he did not know whether taking on those responsibilities constituted a lateral move or a promotion. He was sure, though, that he received no change in pay when he began reviewing the work of other payment processors in August 2009. It thus appears that Wheat and Hatfield simply may have been performing different aspects of the same functional job.

In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), we explained that a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment" to be considered "similarly situated." Instead, a plaintiff need show only that he and his comparator were "similar in all of the *relevant* aspects." *Id.* (internal quotation marks and citation omitted). Granting the appropriate deference to the plaintiff's evidence, it is clear that Wheat created at least a genuine dispute of fact over whether he and Hatfield performed sufficiently similar job functions to be considered similarly situated. More fundamentally, the identity of job responsibilities is not truly *relevant* here to the question of whether Wheat and Hatfield were similarly situated for Title VII purposes. Rather, because Wheat's termination was spurred by a verbal, and potentially physical, altercation, the relevant comparison between Wheat and Hatfield should involve only the two men's roles and actions in the contretemps.

Addressing that issue, the bank also argues that the fourth prong of Wheat's *prima facie* case was not satisfied because Wheat, but not Hatfield, was the aggressor in the matter. Again,

the very formulation of the defendant's argument betrays the bank's misunderstanding of basic summary-judgment jurisprudence. Even the most cursory of examinations of the evidence before the district court and this court reveals that a genuine factual dispute exists regarding Wheat's status as the aggressor in the confrontation with Hatfield. In fact, the deposition testimony establishes that it was Hatfield, not Wheat, who pursued the altercation after the two men had separated initially and gone to their respective "corners." Even Hatfield himself admitted that it was he who took the ill-advised step of reengaging with the plaintiff after their initial encounter. Moreover, even if the defendant's position is premised upon its belief that Wheat was the initial aggressor *when the two men met in the hallway of the bank*, the argument must fail. Although Hatfield claimed that the plaintiff "put his hand in [Hatfield's] face," Wheat stated during his deposition that he was turning around to extricate himself from the argument when Hatfield "assaulted" him by swatting him on his arm. Such divergent explanations of the unfolding of the relevant events creates an obvious dispute of fact that should preclude the grant of summary judgment to the defendant at the *prima-facie*-case stage of the litigation.[4]

Fifth Third's final argument in support of its position that Wheat did not prove that he and Hatfield were similarly situated involves the bank's contention that the two men's differing behavior when being interviewed by Healy after the altercation justified any disparate treatment that ensued. But in making this assertion, the bank again fails to view the evidence before the court in the light most favorable to Wheat. The plaintiff admits that he was rude and "talked over" Healy during his interview and that he did not respond to all of Healy's questions. However, he also claims that he refused to answer certain questions propounded to him only because of his belief that they were not relevant to the investigation. The bank also takes his lack of response to questions regarding the meaning of his statements "Monday is going to be a big day" and "I'll handle it myself" as indications of threats and aggression, sentiments that the

---

[4]Fifth Third directs our attention to the decisions in *Love v. Kent County Road Commission*, 899 F.2d 14 (6th Cir. 1990) (*per curiam*), and *Boles v. Wal-Mart Stores, Inc.*, No. 2:07cv38-KS-MTP, 2008 WL 216528 (S.D. Miss. Jan. 23, 2008), to support its argument that Wheat was not similarly situated to Hatfield because Wheat was the initial aggressor. The facts in *Love* and *Boles*, however, are radically different from the situation presented in this appeal. In *Love*, it was the plaintiff who initially disengaged from a dispute with a co-worker but then returned to rekindle the argument. Thus, Love's actions are more akin to those of Hatfield than those of Wheat, lending little support to Fifth Third's argument on this point. Likewise, in *Boles*, the evidence established that the plaintiff first physically assaulted his co-worker before the co-worker threw a juice bottle at him in retaliation. In contrast, applying settled summary-judgment principles to the case now before us and viewing the evidence in the light most favorable to Wheat, we conclude that it was Hatfield who was the actual aggressor here. In any event, Wheat has demonstrated at least a genuine dispute of fact on the issue.

defendant notes were not expressed by Hatfield when he was questioned. Nevertheless, in light of Curfiss's testimony that he interpreted the comment about Monday being a big day as having a less ominous meaning than that attributed to it by Healy, and in light of the relative ambiguity of Wheat's other comment, Wheat has met his less-than-onerous burden of establishing a *prima facie* case of race discrimination.

### *Legitimate, Nondiscriminatory Reason for Termination*

In the report and recommendation adopted by the district court, the magistrate judge further concluded, "Even if . . . Plaintiff and Hatfield were similarly situated, and Plaintiff could establish a *prima facie* case of discrimination, Fifth Third[ ] has proven a legitimate, nondiscriminatory business purpose for its actions." However, the burden on the defendant at this stage of the *McDonnell Douglas* analysis is not to *prove* the existence of a nondiscriminatory reason for the adverse employment action. Rather, as the Supreme Court has instructed, "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Without question, Fifth Third did *articulate* legitimate, nondiscriminatory reasons for its termination of Wheat. Specifically, Healy referenced: the plaintiff's refusal to cooperate during the interview; what Healy viewed as Wheat's veiled threats toward Hatfield; and Healy's own belief that, because Wheat was the initial aggressor in the altercation with Hatfield, he would resort to physical violence if he were to return to work.

### *Pretextual Nature of Defendant's Articulated Rationales*

Given the bank's presentation of justifications, the evidentiary burden shifted once again to the plaintiff to demonstrate at least a genuine dispute of fact over whether the bank's proffered explanations for its adverse employment decision were pretexts for prohibited racial discrimination. *See, e.g.*, *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Pretext can be shown by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was

insufficient to warrant the adverse employment action." *Id.* (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)).[5]

Our analysis of the pretextual nature of the proffered justifications for Fifth Third's employment decision again must be overlaid with an understanding of the summary-judgment principles at play. In other words, at this preliminary stage of the litigation, Wheat need only identify genuine disputes of fact regarding the legitimacy of the defendant's stated reasons in order to withstand a motion for summary judgment. We conclude that the plaintiff has met that burden.

Taking the bank's claimed nondiscriminatory reasons for firing Wheat in order, the defendant first contends that Wheat's termination was justified by the plaintiff's refusal to cooperate at his interview with Mia Healy. Viewing Wheat's deposition testimony in its most favorable light, however, the plaintiff was reluctant to answer Healy's questions for two underlying reasons: first, Wheat felt that most of the inquiries were not relevant to the investigation and, second, Healy never offered the plaintiff an opportunity to give his side of the story, an opportunity that she did extend to Brad Hatfield during the subsequent interview. If Wheat's explanation is to be believed—as it must be at the summary-judgment stage—his alleged recalcitrance was an insufficient reason to warrant the challenged adverse action.

Similarly insufficient to justify termination was Wheat's utterance of the alleged veiled threat that he would "take care of it [him]self." That comment is nothing if not ambiguous and, without a further explanation that Wheat did not provide, cannot necessarily be considered threatening at all. Fifth Third asserts, however, that the "I'll take care of it myself" comment was not the only veiled threat made by Wheat; the defendant also argues that the plaintiff's claim that "Monday is going to be a big day" should be considered "threatening." The problem with

---

[5]In its appellate brief, Fifth Third cites *Hicks* for the proposition that simply proving the defendant's explanation false is not a sufficient evidentiary showing to impose liability upon the defendant; instead, the plaintiff also must establish that discrimination was the true reason for the employment decision. However, "*[a]t the summary judgment stage*, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, [his] prima facie case is sufficient to support an inference of discrimination at trial." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (emphasis added) (citing *Hicks*, 509 U.S. at 511). *See also Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001) ("when the elements of prima facie case have been met, a plaintiff need not show both pretext and discriminatory intent ('pretext plus') (citing *Reeves*, 530 U.S. at 147)).

the defendant's and the magistrate judge's reliance on that statement to support termination is that Wheat vehemently denied ever making it. Again, at the summary-judgment stage of these proceedings, the court has no option but to credit the plaintiff's version of the facts and, therefore, presume that the comment upon which the defendant purports to rely was never made.

As a final justification for the termination decision, the defendant relies upon Healy's concern that Wheat would resort to physical violence if he returned to work. That concern was fostered in large part by Healy's belief that the plaintiff was the initial aggressor in the matter. Although Wheat first did ask Hatfield whether Hatfield had "a problem," the facts are uncontroverted that Wheat's question did not cause the ensuing altercation. Instead, the plaintiff retreated to his desk after that initial exchange, and no further interactions with Hatfield would have occurred had Hatfield not approached Wheat and accosted the plaintiff verbally. True, the plaintiff was actively involved in the later altercation with Hatfield. However, there is genuine doubt that the simple fact that Wheat engaged in a shouting match with Hatfield was the actual reason for the plaintiff's termination because Hatfield, the other active participant in the argument who *did* use physical violence, was not terminated for almost three months after Wheat was fired. Healy insists that the differing treatment was not based upon Wheat's race but rather upon the fact that she initially was not aware of Hatfield's role in reigniting the argument. The record on appeal suggests otherwise. Hatfield himself claimed that he informed Healy on February 19 of the fact that he had approached Wheat after the two men had ended their initial conversation. Healy's denial of her knowledge of that fact until shortly before Hatfield was terminated calls into question the truthfulness of all her deposition testimony, a question that is best resolved by a jury. Thus, in light of all the facts that Healy must be presumed to have known at the time of the decision to terminate Wheat's employment, her concern over only Wheat's potential for violence could not have motivated the defendant's challenged conduct.

A jury could reasonably conclude that each of the rationales proposed by the defendant for its decision to fire Wheat either had no basis in fact, did not actually motivate the defendant's decision, or was insufficient to warrant the challenged conduct. Wheat thus has established doubt as to the legitimacy of the defendant's explanations and raised the specter that those rationales were merely pretextual.

**CONCLUSION**

The report and recommendation of the magistrate judge failed to accord the plaintiff the deference he was due in ruling on the bank's motion for summary judgment, at which point all facts and the inferences from those facts must be viewed in the light most favorable to the non-moving party. When the facts are so viewed in this case, it is clear that Wheat has raised genuine disputes of material fact that should be resolved by a jury after consideration of the parties' sworn testimony. We therefore REVERSE the district court's grant of summary judgment to the defendant and REMAND this matter for such further proceedings as are appropriate.