NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0341n.06

Case No. 19-1112

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 11, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CEDRIN WINGO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| MICHIGAN BELL TELEPHONE CO., et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: GILMAN, KETHLEDGE, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** Following his termination by Michigan Bell, Cedrin Wingo filed suit alleging that his supervisors violated Title VII and Michigan's Elliott Larsen Civil Rights Act by discriminating against him based upon his race and retaliating against him for claims that he filed with the Equal Employment Opportunity Commission while a Michigan Bell employee. The district court granted summary judgment to Defendants on all claims. Agreeing that Wingo has not presented evidence sufficient for a jury to find in his favor, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

Wingo, an African American male, was a long-time employee of Michigan Bell. He worked as a customer-service specialist, responsible for installing, repairing, and maintaining

Michigan Bell's network infrastructure. Despite his long tenure, Wingo's record at Michigan Bell was not unblemished. To the contrary, he had a history of disciplinary incidents throughout his employment. This string of disciplinary issues continued following Wingo's 2013 transfer to Michigan Bell's garage in Pontiac, where the violations quickly piled up.

Wingo alleges that his violations in Pontiac were attributable not to improper conduct, but rather race discrimination. He attributes discriminatory motives to his day-to-day supervisor, Christopher Dwyer, a Caucasian male, and his second level supervisor, Marlon Redd, an African American male. Shortly after arriving at Pontiac sometime around September 2013, Wingo says he "began sensing" that Dwyer was a racist. Not long thereafter, Wingo alleges that Dwyer said something to the effect of, "I will fire your ass." Around this same time, Wingo filed the first of three EEOC race discrimination charges against Michigan Bell and Dwyer.

Michigan Bell documented Wingo's repeated violations of company policies. It documented at least two such incidents in 2013 (for falsifying and misusing time, as well as quality issues), three in 2014 (for leaving the company vehicle unsecured and quality issues), and thirteen in 2015 (including working without a hard hat, quality violations, leaving his company vehicle idling, leaving his company vehicle unsecured, not completing his assigned duties, and kicking a co-worker's vehicle). The company also documented Wingo's coaching history. Wingo alleges that the number of work violations issued to him by Dwyer was "unusually high," a point echoed by a union representative. Dwyer, in his testimony, acknowledged that the number of violations issued to Wingo was greater than those issued to most other technicians.

As the number of disciplinary violations continued to grow, Wingo filed two more EEOC charges, one in August 2015, and another in September 2015. In the August charge, Wingo complained about being suspended for "charging the wrong task to a job." Wingo alleged that a

company engineer had "authorized the charge," but did not provide any facts indicating why he believed that the discipline was racially related.

The September charge appears to have stemmed from Wingo's suspension pending termination for leaving a "work rodeo" event early, and for thrice failing to turn in his timesheets. Wingo's EEOC complaint questioned his suspension, even though Wingo acknowledged that he had left the rodeo early, characterizing the act as a "stupid mistake." Wingo also alleged that he had been retaliated against for his initial EEOC filing two years earlier, emphasizing the thirteen written warnings accompanied by suspensions that had been issued to him by Dwyer in the intervening period. As evidence of retaliation, Wingo alleged that he received "write-ups for a variety of infractions that [his] co-workers did not similarly receive, even though [he] work[ed] with at least one other person at all times, and often on a team."

Michigan Bell allowed Wingo to return to work under a last-chance (or "back-to-work") agreement. In the agreement, Wingo agreed not to commit another violation on threat of termination. Yet just a week later, Wingo committed numerous violations related to leaving a vehicle idling, taking an unauthorized lunch, not returning to his job site after lunch, falsifying time reporting, and improperly parking his work vehicle. Wingo admitted to most of the allegations, but denied having falsified his time. Michigan Bell in turn suspended Wingo for violating the back-to-work agreement. His employment was later terminated.

Wingo filed suit alleging unlawful discrimination based upon race and retaliation, in violation of both Title VII of the Civil Rights Act and Michigan's Elliot Larsen Civil Rights Act (or ELCRA). The district court granted summary judgment to Michigan Bell and Dwyer on all claims. Wingo filed a timely appeal.

## ANALYSIS

We review a district court's grant of summary judgment de novo. *McGee v. Armstrong*, 941 F.3d 859, 868 (6th Cir. 2019). Summary judgment is appropriate where the evidence, viewed in the light most favorable to the nonmoving party, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a moving party presents evidence that, if uncontradicted, would justify summary judgment, the opposing party has the burden to show the existence of a genuine dispute of material fact. *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (citing 10B Wright, Miller & Kane, *Federal Practice and Procedure* § 2738 (3d ed. 1998)). A genuine dispute of material fact exists only where a reasonable jury could return a verdict for the nonmoving party. *Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 771 (6th Cir. 2019). As a result, to avoid summary judgment, the non-moving party must put forward more than a mere scintilla of supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

*Title VII race discrimination.* To establish a prima facie case of race discrimination under Title VII, Wingo must show that: (1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside of his protected class. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015).

Only the fourth element is at issue—whether Wingo has presented evidence that he was replaced by or treated less favorably than a similarly situated person outside the protected class. Wingo alleges that Dwyer treated him differently than similarly situated white employees who committed similar violations. Those violations, says Wingo, include improperly placing gravel,

4

leaving a work vehicle unlocked, incorrectly "splicing" cables, and leaving a rodeo early. But Wingo lacks personal knowledge to support those allegations. When questioned as to his basis for claiming that other employees were disciplined differently, Wingo had little to offer. At most, he remembered asking some employees whether they received "write ups" for their conduct. Yet he could not remember with whom he spoke, when those conversations occurred, or their substance.

Establishing a prima facie case is not "onerous." *Texas Dep't. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). But it does require more than Wingo offers. *See id.* (explaining that a plaintiff must present enough evidence sufficient for a jury to find in the plaintiff's favor on all elements of the claim); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (same). Wingo's threadbare allegations, supported only by his general impressions of forgotten conversations, are not enough to establish a viable case of discrimination. Given his lack of personal knowledge or other evidence of differential treatment, Wingo has not presented sufficient evidence for a jury to find he was the victim of race discrimination. Accordingly, the district court properly granted summary judgment to Michigan Bell.

*Title VII retaliation.* Wingo next alleges that his termination was in retaliation for filings he made with the EEOC in August and September 2015. To establish a prima facie claim of Title VII retaliation, Wingo must show: (1) that he engaged in a protected activity, (2) his exercise of such protected activity was known by Defendants, (3) thereafter, Defendants took an action that was materially adverse to him, and (4) a causal connection existed between the protected activity and the materially adverse action. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468–69 (6th Cir. 2012). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to offer legitimate, nonretaliatory reasons for its actions. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). If the defendant does so, the burden shifts back to the plaintiff "to

show that the proffered reasons were not the true reasons for the employment decision, i.e., that the reasons were a pretext for retaliation." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019).

As is often the case with retaliation claims, the dispute here centers on the final aspect of a prima facie case—the element of causation. Michigan Bell does not dispute the fact that Wingo filed complaints with the EEOC (protected activity), that the company was aware of those filings (knowledge), or that it disciplined and ultimately terminated Wingo (an adverse employment action). What remains is whether Wingo has pointed to evidence that establishes an inference of a causal connection between his EEOC filings and his termination. This requires proof, even at the prima facie stage, that the unlawful retaliation would not have occurred but for Wingo's protected activity. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc).

On the one hand, as Wingo notes, his final suspension occurred within two months of his September 2015 EEOC filing. In early November 2015, Wingo was suspended pending termination for violating the terms of the back-to-work agreement, and soon thereafter was terminated. But temporal proximity alone is generally not enough to establish the prima facie element of causation. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 629 (6th Cir. 2013); *see also Newton v. Ohio Dep't of Rehab. & Correction-Toledo Corr. Inst.*, 496 F. App'x 558, 567 (6th Cir. 2012) (noting that "causation, not temporal proximity itself . . . is an element of plaintiff's *prima facie* [Title VII retaliation] case"); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (observing that temporal proximity, by itself, "will not support an inference [of retaliation] in the face of compelling evidence" (quoting *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987)). This is especially so when an intervening act disrupts the purported causal chain

between a protected act and an adverse employment action. *See Kuhn,* 709 F.3d. at 628 (finding, in the Title VII context, that the plaintiff did not show the casual connection required for a prima facie case in part because "'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity'" (quoting *Wasek*, 682 F.3d at 471–72 (finding that the plaintiff could not meet the causation prong of his prima facie Title VII retaliation claim because "[a]ll of the available evidence, including [plaintiff]'s own deposition, indicates that the ban was a result of [plaintiff] leaving his work site" and "[plaintiff]'s decision to leave the worksite was an intervening event"))).

Here, that intervening act is Wingo's violation of his back-to-work agreement with Michigan Bell. In the agreement, Wingo promised to abide by "*all*. . . regulations going forward for his position for a period of Twelve (12) months active service from his reinstatement," with termination the stated penalty for noncompliance (emphasis added). Yet as he now acknowledges, he failed to do so, in multiple respects. Wingo admitted to taking an unapproved late lunch, and to parking in the same parking lot as three other technicians while doing so, in violation of company policy. He admitted that he did not return to the job site after lunch. And he admitted to leaving his vehicle idling while doing paperwork, yet provides no evidence that other employees were allowed to idle their vehicles when doing so.

In short, Wingo offers no evidence calling into question whether he violated this agreement. Nor does he contest that the agreement expressly gave Michigan Bell "the sole discretion to determine whether or not termination is appropriate under the circumstances." Wingo's violations thus served as an "intervening cause" for his termination, which negated any potential inference drawn from the temporal proximity between his EEOC filings and his termination. *Wasek*, 682 F.3d at 472; *see also Yazdian v. ConMed Endoscopic Techs., Inc.*, 793

F.3d 634, 652 (6th Cir. 2015) ("[A]n employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions."). We thus see no error in the grant of summary judgment to Michigan Bell on Wingo's retaliation claims.

*State law claims.* Our resolution of Wingo's claims under Michigan law is to the same end. "When construing [the] ELCRA, Michigan courts look to federal Title VII jurisprudence to guide their interpretation." *Rodriques v. Delta Airlines*, 644 F. App'x 629, 633 (6th Cir. 2016) (citing *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 859 (Mich. 2005) (internal alterations omitted)). That is true both for discrimination and retaliation claims because the Michigan courts likewise "use the federal Title VII framework to assess retaliation claims." *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 114 (6th Cir. 2018) (citing *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520–21 (Mich. 2001)). Because we apply the same analysis to Wingo's ELCRA claims as we do to his Title VII claims, we reach the same result: those claims too were properly rejected by the district court.

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the judgment of the district court.