NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0039n.06

No. 25-1586

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 21, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| LADONNA BLEWETT, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| NIKOLE HOWARD-WHISETT; CITY OF DETROIT, MICHIGAN, dba Detroit Water and Sewerage Department, | ) | |
| | ) | |
| Defendants-Appellees. | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; STRANCH and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** LaDonna Blewett was employed by the City of Detroit (the "City") as a professional administrative analyst in the Detroit Water and Sewerage Department. After Blewett was fired from this position, she sued the City and her supervisor, Nikole Howard-Whisett, alleging racial discrimination in violation of the Equal Protection Clause and Michigan state law. The district court granted summary judgment to Howard-Whisett and the City on all claims. We **AFFIRM**.

## I. BACKGROUND

Blewett, who is African-American, began working as a professional administrative analyst, or "staff accountant," in the treasury department of the Detroit Water and Sewerage Department in 2016. Her primary responsibilities were to process incoming and outgoing wire transfers, reconcile any issues with those transfers, and log those transfers in a cashbook. She was expected to submit the cashbook to Howard-Whisett every day between 11 a.m. and 12 p.m., after which

Howard-Whisett would forward the cashbook to another department for further review. Blewett was also required to submit journal entries each month (1) documenting the month's wire transfers and credit card payments and (2) noting any imbalances pending resolution.

The record includes Blewett's performance reviews from 2018 through 2020, as well a "Corrective Disciplinary Action Form" documenting her termination in October 2020. In Blewett's 2018 performance review, Howard-Whisett noted that "[t]he cashbook was not accurate nor completed on a timely basis. There were instances where changes took weeks or months to correct and complete. However, as of lately, there has been significant improvement that I hope will continue." Blewett's 2019 performance review stated, "LaDonna is dependable as far as attendance goes. However, LaDonna has to pay closer attention to deadlines and meet them without me reminding her; especially for things that are routine and reoccurring. LaDonna also makes quite a few errors[.]" Blewett's 2020 performance review, which was completed two months before her termination, contained multiple comments expressing concerns with the timeliness and accuracy of her work, such as "completing assignments and meeting deadlines seem to be a big problem . . . [a]t one point it seemed to be getting better but has since still remains a great concern" and "LaDonna also makes numerous errors on assignments that she has done numerous times." Her 2020 performance review further noted that "[s]he was late completing the cashbook 101 days out of 214 which is 47% of the time late" and "did not have her cashbook reconciled by the 2nd business day on a consistent basis. She was late 10 months out of 12 which is 83% of the time late." Blewett's "dependability and reliability" rating also declined over the course of these three performance reviews, from "Achieved Expectations" in 2018, to "Minimally Satisfactory" in 2019, and finally to "Unacceptable" in 2020.

On the "Corrective Disciplinary Action Form" documenting the reasons for Blewett's termination, Howard-Whisett cited "poor work performance" and the same statistics from the 2020 performance review regarding how often Blewett was late ("101 days out of 214" on her daily assignments and "10 months out of 12" on her monthly assignments). The form further explained that "[o]ften times journal entries had to be done over 2 or 3 times due to errors. There were also recurring journal entries that were missed that had to be put in the next month or the adjustment period."

Blewett, however, claims she was fired not because of her job performance but due to racial discrimination. Throughout her employment, the treasury department consisted of six employees including Howard-Whisett and herself; five of those employees were African-American (including Howard-Whisett), while one of those employees was white—Dawn Green, who was also supervised by Howard-Whisett. Blewett contends Green was afforded special treatment by Howard-Whisett in comparison to her African-American colleagues despite exhibiting her own performance issues, including that one of Green's reconciliation assignments was outstanding for 150 days. Blewett also testified that Howard-Whisett directed harassing comments to her specifically, such as threatening to fire her over her cashbook errors.

Blewett sued Howard-Whisett and the City in the Eastern District of Michigan, asserting three claims: (1) a § 1983 claim for employment discrimination in violation of the Equal Protection Clause, (2) an employment discrimination claim under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), and (3) a hostile work environment claim under ELCRA. The district court granted summary judgment to Howard-Whisett and the City on all claims.

## II.   LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, courts must view the record evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *See Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc). We review a district court's grant of summary judgment de novo. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

## III.   ANALYSIS

Blewett brought claims for employment discrimination under the Equal Protection Clause, employment discrimination under ELCRA, and hostile work environment under ELCRA, all on the theory that she was subjected to discrimination on the basis of race. Blewett argues the district court erred in granting summary judgment to Howard-Whisett and the City because it misapplied the summary judgment standard in several ways, such as by improperly resolving factual disputes and making credibility determinations. The district court's application of the summary judgment standard is not dispositive, however, because we may affirm on any ground that is supported by the record. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).

#### A.      Employment Discrimination Under ELCRA and Equal Protection

Racial discrimination claims under ELCRA are "analyzed under the same evidentiary framework used in Title VII cases." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652 (6th Cir. 2012) (citation modified).  Likewise, when a public employee brings an employment discrimination claim under the Equal Protection Clause, we analyze that claim using the Title VII framework.  *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).  Under the *McDonnell Douglas* burden-shifting framework for Title VII claims, the burden of production begins with the plaintiff, who must make out a prima facie case of discrimination.  *Redlin v. Grosse Pointe Public School Sys.*, 921 F.3d 599, 606 (6th Cir. 2019).  Specifically, the plaintiff "is required to present evidence that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently."  *Ondricko*, 689 F.3d at 653.  We have emphasized that the plaintiff's burden at this stage "is not an onerous one."  *Redlin*, 921 F.3d at 606 (citing *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)).  If the plaintiff can make out a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Ondricko*, 689 F.3d at 653.  Finally, if the employer discharges that burden, the burden shifts back to the plaintiff to show that the employer's asserted reasons "were not its true reasons, but rather were pretext for unlawful discrimination."  *Id.*

Blewett contends she was similarly situated to Green, her white coworker who was not fired, because Green had similar performance issues and was engaged in similar policy violations. A plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, . . . the plaintiff and the

employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citation modified). To be similarly situated, two employees need not have identical job duties, nor even the same supervisor. *See Redlin*, 921 F.3d at 610–11. For instance, "we have held, relying on *Ercegovich*, that a plaintiff claiming racial discrimination was similarly situated to a non-protected employee even though the two individuals "worked in different . . . departments and *had different supervisors.*" *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (emphasis in original) (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003)). That Blewett and Green did not have identical job duties, then, does not necessarily defeat her claims.

But Blewett has not presented evidence from which a reasonable jury could find that she and Green had similar performance issues. Blewett's performances issues are well-documented in the record. Her 2018 performance review, though positive in many respects, identified clear areas for improvement, including that her cashbook "was not accurate nor completed on a timely basis" and that her efforts to remedy these errors included "instances where changes took weeks or months to correct and complete." R. 19-1, Ex., PageID 347–48. Her 2019 and 2020 performance reviews both documented continued struggles to complete her work satisfactorily and on time. Blewett's 2020 performance review, which was completed two months before her termination, described persistent issues in these and related areas: "completing assignments and meeting deadlines seem to be a big problem . . . [a]t one point it seemed to be getting better but has since still remains a great concern"; "LaDonna also makes numerous errors on assignments that she has done numerous times (for example journal entries and cashbook). The time that it takes to redo most of her work wastes valuable time and often leads to confusion not only within Treasury but with the Accounting team"; "LaDonna at most times refuses to be accountable for

her performance." R. 18-2, Ex. B, PageID 324. Consistent with these representations, Blewett's "Dependability and Reliability" rating declined over time, from "Achieved Expectations" in 2018, to "Minimally Satisfactory" in 2019, and finally to "Unacceptable" in 2020.

The record is comparatively thin regarding how well Green performed her job responsibilities. Blewett points to one piece of evidence concerning Green's timeliness or the quality of her work product: according to Blewett's deposition testimony, she recalled seeing an email indicating that 150 days had elapsed on one of Green's credit card reconciliation assignments. Viewing the evidence in the light most favorable to Blewett, a reasonable jury could find that Green was 150 days late on a credit card reconciliation, and that this assignment was similar in at least some respects to Blewett's wire-transfer reconciliation assignments. There is some uncertainty in the record regarding how this 150-day delay compares to Blewett's struggles to complete her assignments on time—namely that the parties have advocated different interpretations of the note in Blewett's 2020 performance review that she "was late completing the cashbook 101 days out of 214 which is 47% of the time late." R. 18-2, PageID 326. According to Howard-Whisett and the City, this statement meant Blewett was late on 101 deadlines over the course of the year, but Blewett suggested in her deposition that it meant she was late *one time* by 101 days and now suggests she was terminated "based on allegations that her cashbook reconciliation was 101 days late." In the same deposition, Blewett denied being 101 days late on a single assignment and, when asked whether she was aware of any times she was late, responded as follows: "I probably was—I can't recall, but I probably was late due to something, I don't know, but 101 days, no." R. 15-2, Ex. A - Blewett Tr., PageID 191. Yet Blewett does not dispute that she was regularly late on assignments, and, in any event, "convenient memory lapses do not create

factual disputes that are genuine." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021).

Moreover, regardless of how many times Blewett was late in 2020 or by how many days, the record contains evidence of persistent performance issues from 2018 to 2020 related to her timeliness and dependability, as well as the quality of her work product. These issues go far beyond the evidence Blewett cites regarding Green's performance issues, which suggests at best that she was very late on a single assignment. Because Blewett and Green were not similarly situated in their performance issues, they were not similarly situated in all relevant respects. *See Ercegovich*, 154 F.3d at 352. For this reason alone, Howard-Whisett and the City were entitled to summary judgment on the Equal Protection and ELCRA employment discrimination claims.

## B. Hostile Work Environment

That leaves Blewett's claim that she was subjected to a hostile work environment in violation of ELCRA. To prevail on a hostile work environment claim based on race under either Title VII or ELCRA, a plaintiff must establish five elements: (1) that she belongs to a protected class, (2) that she experienced unwelcome harassment, (3) that the harassment was based on her race, (4) that the harassment was intended to or did substantially interfere with her employment, and (5) that the defendant knew or should have known about the harassment but failed to act. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020). A plaintiff can demonstrate that harassment was based on race (the third element) either by "pointing to the use of race-specific and derogatory terms or by offering direct comparative evidence about how the alleged harasser treated members of other races." *Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021) (citation modified). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but

actually constituted *discrimination*" on the basis of race. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citation modified).

Blewett testified that sometime in late 2018 or early 2019, she made a complaint to Human Resources regarding a white employee from outside her department, Rob Rice, who said something to Blewett to the effect of "where is your slave driver." She also testified that Rice was disciplined as a result of this incident, receiving two weeks of suspension. Thus, although this was a "race-specific and derogatory" comment, *Strickland*, 995 F.3d at 503, a reasonable jury could not find that Howard-Whisett and the City failed to act in response to this incident. *See Khalaf*, 973 F.3d at 482.

Separately, Blewett contends she was subjected to a hostile work environment in comparison to Howard-Whisett's treatment of Green. But for the same reasons that Blewett and Green were not similarly situated for employment-discrimination purposes, Blewett cannot prevail in her hostile work environment claim on a comparative-evidence theory because a reasonable jury could not find on this record that Blewett experienced discriminatory harassment *because* of her race in comparison to Green. *See id.*; *Oncale*, 523 U.S. at 81. Indeed, when she was asked during her deposition, "Do you think that [Howard-Whisett] made those statements about I can fire you off the cash book and every other thing that you testified to that created a hostile work environment, do you think she did those things because you're African American?," Blewett said "No." R. 15-2, Ex. A - Blewett Tr., PageID 186. Thus, although Blewett points to evidence sounding in both evidentiary routes to proving a hostile work environment claim ("race-specific and derogatory terms" and comparator evidence), *Strickland*, 995 F.3d at 503, she can prevail on neither.

Howard-Whisett and the City were entitled to summary judgment on all claims.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to Howard-Whisett and the City.