*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0254p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

KIMBERLY C. ONDRICKO,

                *Plaintiff-Appellant,*

    *v.*

MGM GRAND DETROIT, LLC,

                *Defendant-Appellee.*

No. 10-2133

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-11073—Anna Diggs Taylor, District Judge.

Decided and Filed: August 8, 2012

Before: KENNEDY, MARTIN, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Gerald D. Wahl, STERLING ATTORNEYS AT LAW, P.C., Farmington Hills, Michigan, for Appellant. Louis Theros, Regan K. Dahle, BUTZEL LONG, Detroit, Michigan, for Appellee.

_____

OPINION
_____

JANE B. STRANCH, Circuit Judge. Plaintiff Kimberly Ondricko seeks reversal of the district court's grant of summary judgment in favor of Defendant MGM Grand Detroit, LLC in her suit for race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Righs Act ("ELCRA"), M.C.L.§ 37.2101 *et seq*. The district court found that Ondricko admitted the employment misconduct that resulted in her termination and that she had not shown disparate treatment of similarly situated comparators. For the following reasons, we **REVERSE** the judgment of the district court.

1

## I. BACKGROUND

Kimberly Ondricko had been working in the gaming industry since 1994 and began working as a Casino Dealer-Trainee for MGM Grand Detroit ("MGM") in September 2003. MGM promoted Ondricko first to a Dealer 1, then to a part-time Floor Supervisor, and lastly to a full-time Table Games Floor Supervisor in October 2005. As a Floor Supervisor, Ondricko was responsible for supervising the Dealers at as many as six gaming tables in an area referred to as a "Pit." MGM argues it fired Ondricko because she participated in a "bad shuffle" at a blackjack table she was supervising. Some background is necessary to understand this argument. Dealers use two sets of different-colored playing cards at each blackjack table and before a Dealer puts any cards into play, they must be shuffled. The Dealer raises a "cut card" into the air to request that the Supervisor approve the shuffle. Upon approval, the Dealer gathers the cards on the table that have already been played (the "discards") and places them in a shuffle machine.

The machine has two chambers: an empty chamber into which the Dealer places the discards and a chamber containing shuffled cards to be put into play. The Dealer presses a button on the shuffle machine, causing the empty chamber to elevate, then places the discards into the empty chamber and presses the button again, causing the chamber with the discards to lower and the chamber with the shuffled cards to rise. The Dealer removes the shuffled cards (which will always be a different color than the discarded cards) from the shuffle machine and puts those cards into play.

On April 27, 2008, Ondricko was the Floor Supervisor in a blackjack Pit where only one customer was playing at one table with Dealer Vivian Baran. Ondricko was standing next to Baran when it came time for Baran to shuffle. Baran gathered the discarded cards and Ondricko pressed the button on the shuffle machine to raise the empty chamber. Baran placed the discards into the empty chamber, but instead of pressing the button to lower that chamber and raise the chamber with the shuffled cards, Baran then removed the same unshuffled cards from the chamber and put them back into

play.  Ondricko testified that she was not aware Baran failed to press the button to lower the chamber with the discards and raise the chamber with the shuffled cards.

As Baran was putting the cards into play, Ondricko noticed the chamber door was still open.  She asked Baran whether she was dealing the same cards, to which Baran said "no," and then investigated whether the shuffle machine had malfunctioned.  Ondricko's investigation occurred while Baran dealt hands for about ninety seconds, after which Ondricko told Baran to stop dealing.  Ondricko immediately notified her superior, the Pit Manager, about the bad shuffle.  Ondricko never left the blackjack table during this shuffle procedure.  MGM suspended Ondricko pending investigation into the incident.  On May 9, 2008, MGM terminated Ondricko based on its Rules of Conduct Policy Number 417, which states:  "What in the business judgment of MGM Grand Detroit jeopardizes the efficiency or integrity of the gaming operation is prohibited."  MGM alleged  Ondricko's conduct violated MGM's "Procedures for Dealing the Cards Using an Automatic Shuffle Devise," which resulted in a violation of Policy 417.

At least six other Supervisors engaged in misconduct related to shuffle procedures.  Only two were terminated.  In January 2004,  Yancy Yharbrough, a black male, was disciplined, but not terminated, for his failure to remove the "10" cards from playing decks during a game which required their omission.  In late July 2008, Carl Barney, a black male, was also disciplined, but not terminated, for two shuffle procedure violations within two weeks, including playing un-cut decks and playing six decks where a game required eight.  Gary Swick, a white male, was terminated in January 2009 after approving a shuffle at a blackjack table.  Specifically, Swick approved this shuffle, the Dealer placed the discards in the empty shuffler chamber, and then Swick left the table to speak with the Pit Manager.  When Swick returned, the Dealer removed the unshuffled cards from the chamber, instead of the newly shuffled cards, and dealt one hand.  Another Floor Supervisor noticed the error and alerted Swick, who was still standing at the table, but had not been watching the shuffle, and Swick reported this to his Pit Manager.  In contrast, in February 2009, Greg Hood, a white male, was given a

five-day suspension for supervising tables where "washed" (not yet used, but unshuffled) cards were put into play.

The remaining two Supervisors engaged in shuffle-procedure misconduct in the months immediately before Ondricko was terminated and were directly addressed by MGM in relation to her termination. In December 2007, Nakeisha Boyd, a black female, was terminated after supervising a mini-baccarat game where the Dealer apparently had trouble removing cards from the shuffler. Boyd assisted the Dealer by removing unshuffled discards from the shuffler and giving those cards, instead of the shuffled cards, to the Dealer to put back into play. In contrast, Warren Black, a black male, was given a three-day suspension after approving a bad shuffle[1] in October 2007 based on violations of the same policies MGM alleges Ondricko violated. After approving the shuffle, Black stepped away from the game table[2] and the Dealer placed the discards into the empty shuffler chamber and then immediately removed the same cards. After a customer cut these cards, but before they were put into play, another Dealer arrived as relief. The new Dealer noticed the wrong cards were on the table and notified Black, who advised the Dealer to put the shuffled cards into play.

Around the time MGM decided to terminate Ondricko, but before she was notified of this decision, Tables Games Assistant Shift Manager Mike Hannon spoke to Mike O'Connor, Vice President of Operations, about Ondricko. Hannon asked O'Connor why Black was only given a three-day suspension, but Ondricko was to be terminated. In response, O'Connor asserted Black did not approve a bad shuffle, but Ondricko did. O'Connor also brought up Boyd, a black female, during the meeting, saying "her attorneys had already called and wanted to know what we were going to do

---

[1]MGM disputes Ondricko's assertion that Black "approved" the shuffle, however MGM admits that "[f]or the purposes of the motion for summary judgment only, taking the facts in the light most favorable to Plaintiff, MGM Detroit presented the facts as if Mr. Black did approve the shuffle." (Appellee Br. at 16 n.6).

[2]There is some dispute as to why Black stepped away from the table. MGM asserts he was assisting another customer, while Ondricko notes Black simply does not appear in the surveillance video and there is no indication of why he was not by the table.

about Kim."  O'Connor then said "do you think I wanted to fire Kim, I didn't want to fire Kim, how could I keep the white girl."

On March 23, 2009, Ondricko filed this action against MGM alleging claims of gender and race discrimination in violation of Title VII and ELCRA.  In 2010, MGM filed a Motion for Summary Judgment asserting Ondricko could not establish a prima facie case of race or gender discrimination based on circumstantial evidence or prove MGM's legitimate nondiscriminatory motive was pretext.  Ondricko opposed this motion, asserting she presented direct evidence of race discrimination and circumstantial evidence of both race and gender discrimination under a mixed-motive standard.  The district court held a hearing and granted MGM's motion from the bench, simply reasoning "that the plaintiff admitted the conduct that had gotten her fired, the bad shuffle, and nobody was treated differently whatsoever, or disparately, that she has called attention to."  No explanatory memorandum or order was entered.  On appeal, Ondricko argues the district court improperly granted summary judgment to MGM because she presented direct and circumstantial evidence of discrimination and the court erred in failing to apply a mixed-motive analysis to her claims.

## II.  ANALYSIS

### A.     Standard of Review

This court reviews a district court's grant of summary judgment de novo.  *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009).  Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (2010).  As the party seeking summary judgment, MGM  bears the burden to show there are no genuine issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  All facts, including inferences, are viewed in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is whether the evidence presents a sufficient disagreement to require submission of Ondricko's claims to a jury or whether the evidence is so one-sided that MGM must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

**B.     Title VII Claims**

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Intentional discrimination claims under Title VII can be proven by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

*1.     Mixed-Motive Analysis*

We must first determine whether Ondricko's race and gender discrimination claims should be analyzed under a mixed-motive or single-motive analysis. It is not entirely clear from the motion hearing transcript whether the district court conducted a mixed-motive analysis or analyzed Ondricko's claims using the *McDonnell Douglas* burden-shifting framework. A mixed-motive analysis applies to cases "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989)). Under § 2000e-2(m) of Title VII, Ondricko can proceed on a mixed-motive claim by demonstrating that her

protected status was a motivating factor in her termination, even though other factors also motivated her discharge.  *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711-13 (6th Cir. 2006).  Ondricko can pursue a mixed-motive claim under Title VII based on direct evidence or solely on circumstantial evidence.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003).  At the summary judgment stage, the ultimate question is whether Ondricko presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that her race or gender were motivating factors in MGM's decision to terminate her employment.  *See Wright*, 455 F.3d at 713.

A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims.  *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010); *see also Bartlett v. Gates*, 421 F. App'x 485, 488 n.1 (6th Cir. 2010) (mixed-motive standard "only applies when plaintiffs provide notice of mixed motive claims").  This treatment can be triggered expressly by invoking the mixed-motive analysis or impliedly through use of the motivating factor test in the complaint and responsive pleadings.  *See Spees*, 617 F.3d at 390 (plaintiff gave adequate notice of mixed-motive claim by alleging pregnancy was a motivating factor and specifying she was bringing mixed-motive claims in a footnote in her motion for summary judgment); *cf. Hashem-Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009) (affirming district court's application of the *McDonnell Douglas*/*Burdine* framework where the plaintiff failed to raise a mixed-motive claim in her complaint or in her response to the defendants' summary judgment motion, and the record was "utterly silent as to mixed motives").

Ondricko gave adequate notice of mixed-motive claims in her response to MGM's motion for summary judgment.  Specifically, Ondricko corrected MGM's discussion of pretext in its motion brief by citing this court's explanation of the summary judgment analysis of *mixed-motive* claims in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008).  Therefore, Ondricko is entitled to a mixed-motive analysis of her Title VII claims.

2.      *Direct Evidence of Race Discrimination*

Ondricko asserts she presented direct evidence of race discrimination based on O'Connor's statement to Hannon: "[D]o you think I wanted to fire Kim, I didn't want to fire Kim, how can I keep the white girl." "In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir. 1999). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

MGM argues O'Connor's statement is similar to the employer's statement in *Dabrowski v. Dow Chemical Co.* that was found not to be direct evidence of race or gender discrimination.   No. 06-11037-BC, 2007 WL 201047, at *3 (E.D. Mich. Jan. 24, 2007).  Dabrowski, a white male, was fired because he lied about his GPA on his application. *Id.* at *1.  His manager explained that the company would enforce its gender- and race-neutral requirement for applicants and could not grant him preferential treatment. *Id.* at *3.  The district court decision in *Dabrowski* is unpublished, not binding on this court, and factually inapposite. *Dabrowski* involved a request by an unqualified job applicant for waiver of a clear, neutrally-enforced application requirement.  That situation is clearly distinguishable from the situation alleged here: a discharge based on an ambiguous guideline, accompanied by evidence of inconsistent application, and explained on the basis of race.  We turn now to de novo review of the grant of summary judgment under applicable precedent.

Looking at O'Connor's statement in the light most favorable to Ondricko and drawing all reasonable inferences in her favor, a reasonable jury could conclude that Ondricko's race was a motivating factor in MGM's decision to terminate her

employment.  *See Wright*, 455 F.3d at 713.  Immediately after discussing inquiries by Boyd's attorneys, O'Connor admitted he did not want to fire Ondricko, but "how [could he] keep the white girl."  This statement was made by an MGM decisionmaker shortly before notifying Ondricko of her termination, immediately after discussing inquiries by a fired black female employee's attorney, and in the same meeting where MGM's decision not to fire a black male for similar conduct is discussed.  Under these circumstances, and in light of the fact that Boyd had a much worse disciplinary record than Ondricko, it is certainly reasonable to conclude from O'Connor's statement that MGM was motivated by a desire to be racially balanced in its terminations for misconduct related to shuffling.  *See Taylor v. Bd. of Ed. of Memphis City Schs.*, 240 F. App'x 717, 720 (6th Cir. 2007) (statement that another applicant was hired to "maintain racial balance" plainly indicated unlawful discrimination may have been a motivating factor in the hiring decision).

Because Ondricko proffered direct evidence of discrimination, the burdens of production and persuasion shift to MGM to demonstrate that it would have fired Ondricko irrespective of its discriminatory intent.  *Nguyen*, 229 F.3d at 563.  Although MGM does not argue its case under a mixed-motive analysis, it asserts that it consistently "terminated employees who have actively participated in bad shuffles."  Ondricko argues this alleged distinction between "active participation" and other forms of shuffle supervision is arbitrary and pretext for MGM's true discriminatory motivation.

Viewing the record in the light most favorable to Ondricko, a jury could reasonably disbelieve MGM's proffered explanation.  *See White*, 533 F.3d at 393 (citing *Loeb v. Texytron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one.")).  First, O'Connor explains to Hannon that Black was not terminated because he did not approve the bad shuffle, while Ondricko did.  However, Black's disciplinary record includes a statement by MGM that Black was being disciplined for approving a bad shuffle, and MGM concedes this approval by Black for the purposes of

summary judgment.  Second, MGM relies on the fact Black walked away from the table and was not present for the improper procedure (removing the same unshuffled cards from the machine) as proof he did not "actively participate" in the bad shuffle. However, Ondricko notes that it seems contradictory for MGM to reward Black for violating a policy which requires him to observe the entire shuffle procedure.  Third, Ondricko points out that her prior disciplinary record was clean while Black, who was not fired, had several prior disciplinary infractions.  Because of these disputed material facts pertaining to the actual motivation involved in MGM's decision, the district court erred in granting summary judgment on Ondricko's Title VII race discrimination claim.

### 3.     *Circumstantial Evidence of Gender Discrimination*

Ondricko relies on circumstantial evidence to establish her Title VII gender discrimination claim.  The same analysis applies for mixed-motive claims under Title VII based on direct or circumstantial evidence, *see Desert Palace*, 539 U.S. at 100-01, and the ultimate question remains whether Ondricko presented evidence from which a reasonable jury could logically infer that her gender was a motivating factor in MGM's decision to terminate her employment, *see Wright*, 455 F.3d at 713.

Ondricko relies on the disparate treatment of her male coworkers as evidence of MGM's discriminatory motive.  "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1995) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 355 n.15 (1977)).  Ondricko shows that seven Supervisors were disciplined for involvement in improper shuffling procedures: five were men, four of whom were suspended for five or fewer days.  In contrast, both women were terminated for their involvement in "bad shuffles."  The one remaining man, Swick, was fired about eight months after MGM fired Ondricko and shortly before she filed the

instant action.[3]    MGM asserts Boyd and Swick are the only two proper comparators because they "actively" participated in bad shuffles, while the other men either did not participate in the same type of shuffle procedure misconduct or, in the case of Black, did not "actively" participate in that misconduct.

Like Ondricko, the plaintiff in *Wright v. Murray Guard* pointed to different punishment of an alleged comparator to establish an inference of unlawful discrimination under a mixed-motive analysis. 455 F.3d 702, 713 (6th Cir. 2006). Wright's comparator was alleged to have engaged in sexual harassment, including coercing one or more subordinates into having sexual relations with him. *Id.* at 710. Wright was alleged to have allowed an unauthorized person into the company facility and to have spread rumors. *Id.* We found that "the alleged acts of misconduct so diverged that they merited different treatment." *Id.* at 713.

This case is not comparable to *Wright*. The different treatment of Ondricko, as compared to that of the four retained male Supervisors, provides an inference of discrimination at the summary judgment stage. As discussed above, there is a disputed issue of fact regarding whether Black's conduct was sufficiently different from Ondricko's conduct to warrant different treatment. The other three men—Yharbrough, Barney, and Hood—who were not terminated were involved in misconduct that differed only slightly from the exact facts involved in Ondricko's offense.[4] MGM admits their misconduct was related to shuffling procedures, but asserts that not all shuffle-related offenses deserve the same level of discipline. MGM does not point to any established policy, either written or verbally communicated to its employees, that distinguishes between different shuffle-related misconduct and provides the corresponding levels of

---

[3]The date Ondricko filed her charge of discrimination with the EEOC, and therefore the date MGM became aware of Ondricko's discrimination claims, is not in the record. She only asserts she filed it timely with the EEOC and that she filed the instant action within ninety days after receiving her Right to Sue Letter.

[4]Yharbrough failed to remove the "10" cards from the decks, as required for a particular game, Barney allowed un-cut cards to be played and approved a game to be played with six decks when eight was required, and Hood allowed unshuffled, "washed" cards to be placed back into play.

discipline. In fact, Vice President of Human Resources Deborah Moffatt testified that MGM references the same Policy 417 on almost all of MGM's termination notices. Therefore, as with Black, when viewed in the light most favorable to Ondricko, there is a disputed issue of material fact regarding whether the misconduct of these men diverges sufficiently to justify different treatment.

MGM also points out that it fired a male Supervisor, Gary Swick, for very similar misconduct. However, given the four similarly situated male employees who were not terminated based on similar conduct, MGM cannot defeat the inference of a discriminatory motive with one comparator who was treated similarly. Based on these disputed issues of material fact, Ondricko has presented evidence from which a reasonable jury could logically infer that gender was a motivating factor in MGM's decision to terminate her employment. *See Wright*, 455 F.3d at 713. Thus, the district court erred in granting MGM summary judgment on Ondricko's Title VII gender discrimination claim.

**C.      ELCRA race and gender discrimination claims**

Section 202 of ELCRA provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). Primarily, "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)); *see Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003).

### 1.      Direct Evidence of Race Discrimination

Ondricko presented direct evidence in support of her race discrimination claim based on O'Connor's statement to Hannon. ELCRA mixed-motive discrimination

claims based on direct evidence are subject to the same analysis as Title VII discrimination claims. *Sniecinski*, 666 N.W.2d at 193. Therefore, for the reasons discussed above, the district court erred in granting summary judgment to MGM on Ondricko's ELCRA race discrimination claim.

2.     *Gender Discrimination*

Ondricko's ELCRA gender discrimination claim, however, requires a different analysis than that under Title VII because Ondricko relies entirely on circumstantial evidence. Although in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the United States Supreme Court determined that a plaintiff in a Title VII action may make out a prima facie claim of discrimination in a mixed-motive case using either direct evidence or circumstantial evidence, Michigan courts continue to require that mixed-motive cases under ELCRA be established by direct evidence. *Millner v. DTE Energy Co.*, 285 F. Supp. 2d 950, 967 n.18 (E.D. Mich. 2003) (citing *Sniecinski*, 666 N.W.2d 186); *see also Watson v. Lowe's Home Ctrs., Inc.*, No. 04-70491, 2009 WL 728547, at *6 n.17 (E.D. Mich. Mar. 19, 2009); *Contri v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911 (6th Cir. 2009) (noting that to survive summary judgment in ELCRA claims based on circumstantial evidence, "a plaintiff also must satisfy the additional burdens set out in *McDonnell Douglas*.") Therefore, in order to survive summary judgment on her ELCRA gender discrimination claim, Ondricko cannot rely on a mixed-motive theory and must satisfy the *McDonnell Douglas* burden-shifting framework based on a single-motive theory.

To establish an ELCRA discrimination claim using the *McDonnell Douglas* framework, a plaintiff is required to present evidence that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently. *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997). If the plaintiff successfully proves a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the

employment decision. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521-22 (Mich. 2001). Once the employer carries this burden, the burden of production shifts back to the plaintiff to show that the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination. *Id.* at 522.

### a.      Prima Facie Case

It is undisputed that Ondricko satisfies the first three elements of a prima facie case of gender discrimination. MGM disputes that similarly-situated comparators were treated differently than Ondricko based on its claim that Boyd and Swick, both terminated, were the only two proper comparators. "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *cf. Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 410 (Mich. 1997) ("While federal precedent interpreting the federal Civil Rights Act is not binding in Michigan, it is often used as guidance by Michigan courts."). Rather, the plaintiff and the employee with whom the plaintiff seeks to compare herself must be similar in "all relevant aspects." *Ercegovich*, 154 F.3d at 352. Further, a plaintiff's burden at the prima facie stage is "not onerous" and "poses 'a burden easily met.'" *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

There are five potential male comparators: Black, Swick, Yharbrough, Barney, and Hood. All five were Floor Supervisors, like Ondricko, overseeing Dealers that engaged in misconduct. MGM concedes that the misconduct in each case related to shuffling procedures. Each of these cases relied only on the failure to properly supervise the shuffle and not on other concurrent misconduct. Based on these facts, all five men are similarly situated in all relevant aspects to Ondricko. Because four of these men were given short suspensions without pay, rather than terminated, Ondricko has shown

that similarly situated employees outside the protected class were treated differently.[5] The district court erred in finding that "nobody was treated differently whatsoever, or disparately, that she has called attention to."

### b.    Nondiscriminatory Justification and Pretext

Because Ondricko has shown a prima facie case of discrimination, the burden of production shifts to MGM to articulate some legitimate, nondiscriminatory reason for the employment decision. *Hazle*, 628 N.W.2d at 521-22. MGM asserts it terminated Ondricko because she admittedly participated in a bad shuffle which violates its procedures and policies. Ondricko asserts this is pretext for discrimination.

A plaintiff can establish that a defendant's reasons for termination are pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Dubey v. Stroh Brewery Co*, 462 N.W.2d 758, 760 (Mich. Ct. App. 1990). "[T]he evidence and inferences that properly can be drawn from the evidence presented during the plaintiff's prima facie case may be considered in determining whether the defendant's explanation is pretextual." *Town*, 568 N.W.2d at 69. For the same reasons discussed under her Title VII gender discrimination claim, Ondricko has presented evidence creating a genuine issue of material fact that, although her misconduct was a factor in her discipline, it was not sufficient to justify the decision to terminate her employment. Therefore, the district court erred in granting summary judgment on Ondricko's ELCRA gender discrimination claim.

---

[5]As mentioned above, although Swick was terminated for similar conduct, MGM cannot defeat Ondricko's "not onerous" prima facie burden by showing one similarly-situated comparator was treated similarly when she points to four such comparators who were not.

## III.  CONCLUSION

For the foregoing reasons, the district court erred in granting summary judgment in favor of MGM on Ondricko's discrimination claims and we **REVERSE** the grant of summary judgment and **REMAND** the case for trial.