*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANTHONY MOORE,

　　　　　Plaintiff-Appellant,

v

HUNTINGTON NATIONAL BANK,
HUNTINGTON BANCSHARES, INC., and ERIC
DIETZ,

　　　　　Defendants-Appellees.

UNPUBLISHED
May 27, 2021

No. 352368
Genesee Circuit Court
LC No. 18-111589-CZ

Before: CAMERON, P.J., and BORRELLO and REDFORD, JJ.

PER CURIAM.

In this employment-discrimination action under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., plaintiff appeals as of right the trial court's order granting summary disposition in favor of defendants[1] under MCR 2.116(C)(10). For the reasons set forth in this opinion, we reverse.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, a black man, worked in the banking industry for about 20 years before being fired on July 9, 2018. From approximately 1999 to 2016, plaintiff worked for Citizen's Bank, then First Merit Bank. During that time frame, the record reveals that plaintiff received raises and positive comments about his work. In 2016, when Huntington purchased First Merit Bank, plaintiff reapplied for his position with the new bank and was hired as a Private Banking Service Specialist II (PBSS). Plaintiff's role primarily involved supporting Pamela Root-Palinsky, who was a

---

[1] Defendant Huntington Bancshares, Inc., was dismissed without prejudice from the case on the basis of a stipulation of the parties. In light of that entity's almost immediate dismissal from the case, this opinion will not address Huntington Bancshares's involvement, will use the term "Huntington" to refer exclusively to Huntington National Bank, and will use the collective term "defendants" to refer to Huntington National Bank and Eric Dietz.

relationship manager and private banker for Huntington in the private bank unit. The private bank provided services to certain qualifying customers. One of plaintiff's responsibilities as a PBSS was to ensure that clients' accounts did not become dormant, which would occur if an account was inactive for certain period of time. The funds in a dormant account could eventually escheat to the State of Michigan. Eric Dietz, who was plaintiff's supervisor and the Regional Director of East Michigan for Huntington, testified that a list is routinely distributed of accounts that are falling into dormant status, and a PBSS "is responsible for actioning that list and moving those accounts from dormant to active." Huntington had a specific policy and procedure regarding how to handle dormant accounts; the procedure did not involve an employee depositing his or her own money in the clients' accounts.

After being hired by Huntington, plaintiff apparently had some struggles with adapting to new systems and procedures. He received additional training, and areas needing improvement were identified. Nonetheless, his 2017 year-end performance review that was completed by Dietz indicated an overall rating of "fully meets" expectations.

In May 2018, plaintiff was provided with a list of accounts that were in dormant status. Instead of following the established procedure, plaintiff decided to deposit one penny of his own money into each of six separate client accounts. Plaintiff testified in his deposition that each of these clients were contacted by plaintiff or bank officers via phone or e-mail, and that the clients each approved this course of action to remove their accounts from dormant status. Plaintiff testified that "the pennies were deposited only after instruction was given to me to do so." According to plaintiff, the officers that contacted some of these clients were Janice Sova and Anne Carey.[2] Sova was a client advisor or relationship manager in the private bank for Huntington, and she served as a point of contact for private bank clients. Carey was a trust advisor in the private bank for Huntington.

Plaintiff was asked in his deposition why he had proceeded with this course of action rather than following the established procedures for handling dormant accounts. He testified that he had spoken to Cathy Doerr, a Huntington branch manager, and that "she said that that was a procedure that she did. That she would contact people and then she would deposit the penny and it would restore – it would eliminate the dormant status." Doerr testified in her deposition that plaintiff did not ask her a question about dormant accounts or seek her guidance "per se" about how to handle dormant accounts. She also testified that plaintiff "did not directly state he was going to take an action regarding dormant accounts." However, Doerr also testified that she and plaintiff "did have a conversation about dormant accounts." Doerr explained:

> [Plaintiff] came over one day, came over into the branch, stated he had several dormant accounts, and frustrated isn't the right word for it, but maybe overwhelmed to some extent. And so, I did state to [plaintiff], and I says well, you do realize it only takes a penny in order to activate these dormant accounts. The

---

[2] Plaintiff's testimony was somewhat unclear on this point, but he testified that "[a]t least those two" contacted clients.

transaction does have to be directed by the customer and the customer has to be present to make the deposit. And he said oh, okay.

Plaintiff also testified that he spoke to Sova about her client's dormant status account and assisting her client "to make the impact as less traumatic to the client as possible." According to plaintiff, Sova was aware that plaintiff was going to deposit a penny into her client's account to assist the client, and Sova said, "Do whatever needs to be done to cause this person less heartache." Plaintiff testified that Sova gave him "the direction that it was okay for me to do the penny in order to [remove the account from dormant status]." Sova testified in her deposition that she received an email from plaintiff indicating that he could reactivate a dormant account by depositing a penny, but she never responded. She did not recall any verbal conversation with plaintiff about how to reactivate a dormant account. Sova testified that she did not know that plaintiff deposited a penny of his own money into any client accounts. Sova further testified that there had been instances at First Merit where a private bank employee deposited personal funds into a customer account but that she had never been informed of such occurrences happening at Huntington.

Additionally, plaintiff testified that Carey had clients on the list of dormant status accounts and that he told her that he would deposit a penny in these accounts to remove the dormant status. Carey testified in her deposition that she specialized in trusts and that she was not trained in the "banking side," which is where plaintiff worked. Carey stated:

> My conversation on dormant accounts with him was he would come to me and say, again, the client has a dormant account out there, and I would, basically I always expect that he would know what he's supposed to do. I would say, you know, take care of it, if there's anything you need me to do let me know.

Carey testified that she was not aware that plaintiff put his own money into any customer's account. She did not know of anyone at Huntington having deposited personal funds into a client account and she did not know of anyone at First Merit having deposited personal funds into a dormant account.

Plaintiff testified that the rules were not "completely" followed in the private banking department. He stated that Root-Palinsky had previously instructed him to make deposits into client accounts with funds she provided. Plaintiff explained that Root-Palinsky gave him personal funds from her wallet to deposit into a client's account if it had been newly opened and not funded properly so as to prevent the account from closing. Plaintiff claimed that this had happened more than three times and that it had happened at Huntington. However, plaintiff did not consult Root-Palinsky beforehand with respect to the specific dormant account transactions at issue in this case. Plaintiff also testified that Brad Fogleman, another Huntington employee in the private bank, would process transactions for clients without the necessary signatures and then obtain the clients' signatures after the fact.

Root-Palinsky testified in her deposition that she did not know that plaintiff was going to deposit his own funds into the dormant accounts until after he had already made the transactions. Plaintiff had never previously asked her for advice about how to reactivate a dormant account, and she had never told plaintiff that she had used her own funds to activate a dormant account. She further testified that she had never used her own personal funds to activate a dormant customer

account. Root-Palinsky appeared to admit that she had deposited her own money into clients' accounts as plaintiff claimed, but she testified that she had only done so while working for First Merit, that she had never done this for dormant accounts, and that she had never done this while working for Huntington. She did not know of any other Huntington employees who had deposited personal funds into a customer's account.

When plaintiff actually made the one-cent deposits at issue, he went to Doerr's branch and Doerr processed the transactions. Doerr testified that plaintiff came into the branch at some point after their previous discussion about dormant accounts. She described the transaction as follows:

> He came over one time with a deposit. We did the deposit. Didn't really have a conversation about it. It was maybe a few weeks later or again a period of time, and [plaintiff] came over with a couple of deposits. And when I say a couple I couldn't tell you for sure how many. And he had the deposit tickets filled out and he had the pennies. And I said oh, you're making the penny deposit. And he said yes. And I said well, you know, this does have to be directed by the customer and the customer does have to be present in order for these transactions to occur. And at one point [plaintiff] said well, I have pennies in my drawer. And I said well, you better be careful.
>
> And [plaintiff] also stated he had an e-mail from a client that gave him authorization. And I said well, that isn't anything we'd be able to do here. I said but I know you do different things in private banking than we're allowed to do in retail. I just caution you to be careful.

Dietz testified in his deposition that plaintiff's conduct of depositing his own pennies was a serious breach of the rules and that an employee depositing his or her own personal funds into a client's account was a terminable offense because it constituted manipulation of a client's account. Denise Williams, who worked in Huntington's human resources department, testified in her deposition that plaintiff's action of depositing his personal funds into the dormant accounts was a violation of the code of conduct and that depositing personal funds into a client's account is typically a terminable offense. Williams was not aware of any other employee who had deposited personal funds into a customer's account and not been terminated from employment. Williams testified that another employee in Ohio, who was a white woman, had used $1.57 of her own money to pay off the balance of a customer's loan and that this employee was terminated. With respect to plaintiff, Williams' role was to gather the pertinent facts and information as part of the process for determining whether plaintiff would be discharged. During this process, Williams spoke to Root-Palinsky and Dietz; she did not interview plaintiff before the termination decision was made although there was no Huntington policy prohibiting her from doing so.

Plaintiff's employment was subsequently terminated. Dietz testified that plaintiff's employment was terminated solely because of the above incident involving the dormant accounts. Williams also testified that plaintiff's employment was terminated because he violated the code of conduct by depositing his personal funds into the dormant accounts. Dietz additionally testified that he had never seen any compliance or other internal investigative report regarding how plaintiff handled the dormant accounts. He further testified that there was no documentation or report

produced during the investigation period before plaintiff's employment was terminated. Plaintiff was replaced by a white woman.

Plaintiff testified in his deposition that he believed his employment was terminated because of "racism" and because he was a "black male." He claimed that he "did a transaction that was instructed by white females" and that "it's the black male who is looking for another job, when white females who assisted in the transaction are still employed by Huntington." Plaintiff testified that Root-Palinsky, Sova, Carey, and Doerr were the white women who assisted in the transaction.

Plaintiff sued, alleging that his termination was based on racial and gender discrimination in violation of the ELCRA. Plaintiff also raised a second count alleging generally that he had complained about being treated differently than other employees and that defendants retaliated against him for these complaints in violation of the ELCRA.

Defendants moved for summary disposition under MCR 2.116(C)(10) arguing that there was no genuine issue of material fact that plaintiff's employment was terminated based on his violation of the dormant account policy and code of conduct rather than unlawful racial discrimination or retaliation. Defendants contended that plaintiff had no direct evidence of discrimination and that plaintiff could not satisfy the first or third steps of the *McDonnell Douglas*[3] framework.

According to defendants, plaintiff could not establish a prima facie case of discrimination under *McDonnell Douglas* because he could not show that he was qualified for the position. Defendants contended that the record evidence reflected that plaintiff's work performance was deficient leading up to his termination that he was therefore unqualified because he was not meeting Huntington's employee expectations. Further, defendants maintained that plaintiff's violation of the code of conduct provided a legitimate, nondiscriminatory reason to terminate his employment even if plaintiff had established a prima facie case of discrimination. Moving to the third step under *McDonnell Douglas*, defendants argued that plaintiff could not demonstrate that this reason was a pretext for unlawful discrimination because he had no evidence of any similarly situated employees being treated differently for depositing personal funds into a client's account. With respect to the retaliation claim, defendants argued that plaintiff's admissions in his depositions established that there was no evidence that he had engaged in protected activity that was causally related to his discharge.

Plaintiff responded, primarily arguing that Root-Palinsky, Sova, and Doerr were involved in the incident to various degrees, were all white women, and were not disciplined. Plaintiff also appeared to argue that the evidence that no investigatory reports were used as part of the decision-making process leading up to termination, as well as the severity of the punishment for such a minor error issue showed pretext, and that Dietz told plaintiff that previous mistakes had not been punished as harshly. Plaintiff additionally contended that defendants had waived any challenge to his gender discrimination claim by failing to make any argument directed at this claim in their summary disposition motion and accompanying brief.

---

[3] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

The trial court held two hearings on the motion, during which the parties made oral arguments consistent with their written filings. Plaintiff withdrew the retaliation claim, and the trial court dismissed that count. The trial court also stated on the record that the gender discrimination claim was dismissed because "I don't see anywhere in the record that they've got anything on gender."

Following the second hearing, the trial court issued a written opinion and order granting summary disposition in favor of defendants on plaintiff's racial discrimination claim. The trial court concluded that plaintiff could not prove a prima facie case of discrimination because the evidence gave "rise to a finding that [plaintiff] was not performing at a satisfactory level of Huntington National's expectations, and as such he was not qualified for the position." The trial court ruled that defendant was entitled to summary disposition on this basis. Despite reaching that conclusion, the trial court also determined that plaintiff had not presented evidence to rebut defendants' legitimate business reason for firing plaintiff. Thus, for that reason as well, the trial court granted defendants' motion for summary disposition. This appeal followed.

## II. PLAINTIFF'S DISCRIMINATION CLAIMS

Plaintiff argues the trial court improperly granted summary disposition in favor of defendants regarding plaintiff's discrimination claim.

## A. STANDARD OF REVIEW

This Court "reviews de novo decisions on motions for summary disposition brought under MCR 2.116(C)(10)." *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).

"In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id.* "A genuine issue of material fact exists when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Auto-Owners Ins Co v Campbell-Durocher Group Painting & Gen Contracting, LLC*, 322 Mich App 218, 224; 911 NW2d 493 (2017) (quotation marks and citation omitted). "The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Hastings Mut Ins Co v Grange Ins Co of Mich*, 319 Mich App 579, 583-584; 903 NW2d 400 (2017) (quotation marks and citation omitted).

## B. LAW AND ANALYSIS

In Michigan, the "ELCRA prohibits employers from discriminating on the basis of race." *White v Dep't of Transportation*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 349407); slip op at 3; see also MCL 37.2202(1)(a). The ELCRA also prohibits discrimination on the basis of sex. MCL 37.2202(1)(a). The relevant statutory provision, MCL 37.2202(1)(a), provides as follows:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, *discharge*, or otherwise discriminate against *an individual with respect to employment*, compensation, or a term, condition, or privilege of employment, *because of* religion, *race*, color, national origin, age, *sex*, height, weight, or marital status.  [Emphasis added.]

As an initial matter, it is evident that plaintiff has presented his case as a claim that he was discriminated against on the basis of *both* his race and gender.  He is a black man and compares his treatment with that of other employees who are white women.  Both race and sex protected classes under the ELCRA, and they need not be separated into distinct claims.  See *Wilcoxon v Minnesota Min & Mfg Co*, 235 Mich App 347, 367, 368-369; 597 NW2d 250 (1999) (treating the plaintiff's racial and gender discrimination claims together as a claim of discrimination on both grounds).

In this case, by comparing his treatment to that of white women employees, plaintiff's combined racial and gender discrimination claims relied on the same evidence.  Thus, the trial court clearly erred by dismissing plaintiff's gender discrimination claims on the ground that there was no evidence of this claim, while nonetheless considering the record evidence for purposes of the racial discrimination claim.  *Pace*, 499 Mich at 5.  Instead, the proper inquiry is whether the record evidence created a genuine issue of material fact regarding plaintiff's asserted racial and gender discrimination claim.  We thus address the evidence while considering both of these claims together.  *Wilcoxon*, 235 Mich App at 367, 368-369.

"The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination."  *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016).  "In some discrimination cases, the plaintiff is able to produce direct evidence of racial [or gender] bias.  In such cases, the plaintiff can go forward and prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case."  *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001).  Plaintiff does not appear on appeal to rely on direct evidence to support his argument that the trial court erred by granting summary disposition in defendants' favor.[4]  Thus, in cases such as this one, where "there is no direct evidence of impermissible bias, plaintiff's claim of intentional discrimination must proceed under the *McDonnell Douglas* burden-shifting framework."  *White*, ___ Mich App at ___; slip op at 3 (quotation marks and citations omitted).

In *Hazle*, 464 Mich at 463, our Supreme Court stated:

Under *McDonnell Douglas*, a plaintiff must first offer a "prima facie case" of discrimination.  Here, plaintiff was required to present evidence that (1) she

---

[4] Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Hazle*, 464 Mich at 462 (quotation marks and citations omitted).  The focus of plaintiff's appellate arguments is clearly directed at the trial court's application of the *McDonnell Douglas* framework.  Our analysis will therefore be focused accordingly.

belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination.

A rebuttable presumption of discrimination arises if a plaintiff sufficiently establishes a prima facie case. *Id*. at 463-464. The defendant may rebut this presumption by articulating "a legitimate, nondiscriminatory reason for its employment decision." *Id*. at 464. If the employer articulates a legitimate, nondiscriminatory reason and supports it with evidence, the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id*. at 464-465. The burden then "shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *White*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted).

Our Supreme Court explained in *Hazle*, 464 Mich at 465-466:

At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." . . . [A] plaintiff "must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination."

The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [Citations omitted; second alteration in original.]

## 1. PRIMA FACIE CASE

In this case, there is no dispute that plaintiff is a black man, that he was terminated from his employment, and that he was replaced by a white woman. The parties only dispute whether plaintiff was qualified for the position such that he could satisfy the third requirement of establishing a prima facie case of discrimination. See *Hazle*, 464 Mich at 463. Defendants argue that plaintiff was not qualified, and they point to the record evidence illustrating plaintiff's various work-performance issues during the time preceding his one-cent deposits. However, both defendants and the trial court ignore the evidence that plaintiff received an overall rating of "fully meets" expectations in his most recent performance review. Defendants, and the trial court, instead focused only on the evidence that various supervisors and coworkers had complaints about the quality and dependability of plaintiff's work.

"An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations." *Town v Mich Bell Tel Co*, 455 Mich 688, 699; 568 NW2d 64 (1997)

(Opinion by BRICKLEY, J.). "Being qualified for a job, for purposes of establishing a prima facie case of discrimination, requires only minimal qualification." *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 369; 597 NW2d 250 (1999).

Here, there was evidence that plaintiff fully met his employer's expectations despite there also being evidence that his work performance was deficient in certain areas. The trial court appears to have made a finding of fact based on its view of the relative strength of the evidence. This of course, again, was error as a trial court does not resolve conflicts in the evidence or weigh the evidence on a summary disposition motion under MCR 2.116(C)(10). *Hastings Mut Ins*, 319 Mich App at 583-584. Applying the proper evidentiary standard to the record facts by viewing the evidence in the light most favorable to plaintiff as the nonmoving party, *Maiden*, 461 Mich at 120, plaintiff presented evidence that he was at least minimally qualified for the position. Consequently, plaintiff satisfied the requirement of establishing a prima facie case. *Hazle*, 464 Mich at 463; *Town*, 455 Mich at 699 (Opinion by BRICKLEY, J.); *Wilcoxon*, 235 Mich App at 369. In reaching this conclusion, we note that "[t]he purpose of the prima facie case is to force the defendant to provide a nondiscriminatory explanation for the adverse employment action." *Town*, 455 Mich at 699 (Opinion by BRICKLEY, J.).

The trial court thus erred by ruling as a matter of law that plaintiff had failed to establish a prima facie case under *McDonnell Douglas* framework. Because plaintiff demonstrated a prima facie case, the burden shifted to defendant to provide evidence of a legitimate, nondiscriminatory reason for plaintiff's termination. *Hazle*, 464 Mich at 464-465.

## 2. LEGITIMATE NONDISCRIMINATORY REASON

In articulating a legitimate, nondiscriminatory reason for plaintiff's discharge, defendants rely on the testimony of Dietz and Williams indicating that plaintiff's employment was terminated based solely on his deposits of his personal funds into the dormant accounts that constituted a violation of the code of conduct. Both Dietz and Williams testified that plaintiff's conduct was a serious and terminable offense. Clearly, this reason relates only to plaintiff's actions and has nothing to do with his race or sex. Thus, defendants articulated a legitimate, nondiscriminatory reason that was supported by the evidence. *Id*. at 464-465. Resolution of this appeal thus turns on whether plaintiff produced evidence to create a genuine issue of material fact that defendants' asserted reason was a pretext for unlawful discrimination. *White*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted).

## 3. PRETEXT

Plaintiff essentially argues that defendants' articulated reason for discharging him was a pretext for unlawful discrimination because the rules and policies at issue were selectively enforced. Plaintiff argues that there is record evidence that he was punished more severely than others for the same conduct and, particularly, that there was record evidence showing that other white female employees who had deposited personal funds into client accounts or who were involved in his transaction that is at issue in this case were not disciplined at all even though he was terminated from his employment.

As our Supreme Court has noted, "[t]here are multiple ways to prove that a plaintiff was the victim of unlawful discrimination." *Hecht*, 499 Mich at 607. "A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. *Major v Village of Newberry*, 316 Mich App 527, 542; 892 NW2d 402 (2016) (quotation marks and citation omitted). Additionally,

> A plaintiff can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic. An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race [or gender], can give rise to an inference of unlawful discrimination. In order for this type of "similarly situated" evidence alone to give rise to such an inference, however, our cases have held that the "comparable" employees must be *"nearly identical" to the plaintiff in all relevant respects*. [*Hecht*, 499 Mich at 608 (citations omitted; emphasis added).]

In this case, defendants contend that the only sufficiently comparable employee to plaintiff is a Ohio woman who was also discharged for the similar action of using $1.57 of her own personal funds to pay the remaining balance on a customer's loan. We concur with defendants that the Ohio discharge is evidence that plaintiff was not treated differently than a similarly situated employee who was not the same race or gender as plaintiff, and such evidence would tend to undermine plaintiff's argument that he was subjected to unlawful discrimination. *Id*.

However, plaintiff also argues that there are other similarly situated employees to be considered as comparators. Plaintiff testified that there was a culture in the private banking department that tolerated deviations from the rules while emphasizing or prioritizing the focus on pleasing the customers. According to plaintiff, there were instances where Root-Palinsky had given him a dollar from her wallet to deposit in client accounts that had not been properly funded so as to prevent those accounts from closing. Plaintiff testified that this occurred on at least three occasions while he and Root-Palinsky were employed at Huntington. Plaintiff stated further that Root-Palinsky "had given [him] instructions before to do transactions into client accounts and had given [him] funds to do deposits into accounts." Root-Palinsky seemed to admit in her deposition that she had done this while at First Merit, but claimed she had never done so with dormant accounts or at Huntington.

Williams testified that when she spoke to Root-Palinsky before plaintiff was terminated about plaintiff's handling of the dormant accounts, Root-Palinsky mentioned this procedure that had been used at First Merit. Dietz, who supervised Root-Palinsky, testified that he had never investigated or requested an investigation whether Root-Palinsky had ever conducted improper transactions of depositing her own personal funds into dormant accounts. Williams testified that she never investigated Root-Palinsky.

Defendants argue that Root-Palinsky is not similarly situated to plaintiff because she did not deposit her own funds into client accounts, she was not directly involved in the specific transactions made by plaintiff that are at issue in this case, and Huntington was unaware of her alleged conduct. First, defendants ignore the conflicting evidence that Root-Palinsky actually did

deposit personal funds into client accounts while employed by Huntington and that Williams learned during the investigation that plaintiff believed his actions were the same as actions Root-Palinsky had taken in the past with respect to the deposits. It is improper for a court to resolve these factual conflicts on summary disposition. *Hastings Mut In*, 319 Mich App at 583-584. Moreover, it is evident from the testimony of Diezt and Williams, as well as from Huntington's reliance on the treatment of the Ohio employee to justify plaintiff's termination, that it is the act of depositing an employee's personal funds into any client account that is considered a serious offense, not just such a deposit in a dormant account.

Second, the "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.' " *Ercegovich v Goodyear Tire & Rubber Co*, 154 F3d 344, 352 (CA 6, 1998) (citation omitted); accord *Hecht*, 499 Mich at 608 ("[O]ur cases have held that the "comparable" employees must be "nearly identical" to the plaintiff in all relevant respects.") (citation omitted). "We are not bound by federal precedent interpreting analogous questions under Title VII of the 1964 Civil Rights Act, but that caselaw is generally considered persuasive." *White*, ___ Mich App at ___; slip op at 6. Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F3d at 352.

Here, both plaintiff and Root-Palinsky worked in the private banking department and were supervised by Dietz. There was evidence that Root-Palinsky, like plaintiff, had deposited personal funds into client accounts. The record evidence reflects that Huntington considered an employee's deposit of personal funds into a client account of any kind to be a terminable offense: Dietz testified that this was the case because it constituted manipulation of a client's account, and Huntington relied on the termination of an employee in Ohio for using personal funds to pay off a customer's loan to justify plaintiff's discharge in this case. Accordingly, even if Root-Palinsky did not deposit personal funds into a *dormant* account, her alleged actions are still sufficiently similar to plaintiff's conduct. We therefore conclude that plaintiff and Root-Palinsky were nearly identical in all *relevant* respects for purposes of comparison in this context under the facts of this case. *Hecht*, 499 Mich at 608; *Ercegovich*, 154 F3d at 352.

Additionally, plaintiff testified that Sova, Carey, and Doerr were involved to various degrees in the specific dormant account transactions at issue. Plaintiff claimed that Sova and Carey had contacted some of the clients involved to obtain their authorization to make the one-cent deposits. Both Sova and Carey were employed in the private bank department. Plaintiff claimed that Sova directed him to complete the transactions at issue to remove the dormant status for her client's account, although Sova denied ever giving such an instruction and disavowed having any prior knowledge that plaintiff planned to deposit his own funds into a client's account. Plaintiff further testified that he told Carey of his plan for removing the dormant status of these accounts. Carey testified, however, that she was not made aware that plaintiff put his own money into any customer's account and that she trusted plaintiff to know how to proceed on the "banking side" since she only worked with trusts. At the summary disposition stage, we must view this evidence in the light most favorable to plaintiff and may not resolve the conflicting evidence. *Maiden*, 461 Mich at 120; *Hastings Mut Ins*, 319 Mich App at 583-584.

Plaintiff also testified that Doerr had told him that this procedure was one she used. Doerr disputed this, but we do not resolve or weigh conflicting evidence on summary disposition. *Hastings Mut Ins*, 319 Mich App at 583-584. Doerr was the employee who actually processed plaintiff's deposits. She told him that the customer's needed to be present, thus demonstrating her awareness of proper protocol, and nonetheless processed the deposits despite that the customers were not present.

While defendants are correct that plaintiff was the person who actually deposited his own personal funds into clients' accounts, we conclude that it is highly relevant under the particular circumstances of this case that Doerr, Carey, and Sova were allegedly so closely connected to the completion of the transaction and that there is evidence supporting that they helped facilitate the transaction in various ways, including processing the deposits (Doerr) and obtaining authorization from the clients for the transactions (Carey and Sova). Doerr, Carey, and Sova were thus similarly situated to plaintiff for purposes of comparison in this context under the facts of this case. *Hecht*, 499 Mich at 608; *Ercegovich*, 154 F3d at 352.

Turning to a comparison of plaintiff's treatment with that of other similarly situated employees, Williams testified that she was aware before plaintiff was discharged that he claimed to have been coached by other Huntington employees regarding the action he took. Yet, she did not speak to him as part of her fact-gathering investigation to obtain more information about these claims. Further, the testimony of Doerr, Carey, and Sova, indicates that none of them were questioned by Huntington's human resources or compliance departments. Although Williams discussed plaintiff's conduct specifically with Root-Palinsky, Root-Palinsky's similar prior actions were never questioned. Plaintiff testified that on the day his employment was terminated, Dietz told him "that this has happened before but never punished to this degree." Dietz testified that he never made such a statement. Dietz testified that the clients affected by plaintiff's transactions were never contacted or notified about the transactions.

Viewing the evidence in a light most favorable to plaintiff as the nonmoving party, a reasonable jury could conclude Huntington failed to contact other employees closely connected with the underlying factual circumstances of the actions for which plaintiff was discharged, and failed to question or investigate allegations of similar conduct by another employee, and as such, demonstrated a lack of diligence and completeness in the investigation leading to plaintiff's termination. Yet, defendants maintain strongly, that the conduct at issue is considered by Huntington to be a serious offense. Given that other employees were white women and defendant was a black man, taking the evidence in the light most favorable to the nonmoving party, a reasonable jury could conclude that a more thorough investigation was warranted for such a serious allegation and that such an incomplete investigation demonstrated that defendants' articulated reason for plaintiff's discharge was a pretext for unlawful discrimination. A reasonable jury could further conclude that such discrimination was a motivating factor in termination plaintiff's employment. *Major*, 316 Mich App at 542; *Hecht*, 499 Mich at 607-608.

We acknowledge that there was also evidence that a white female employee in Ohio was discharged for an action similar to plaintiff's actions in the instant case. However, when there are multiple similarly situated employees who were treated differently than the plaintiff and did not share the plaintiff's protected classification, an employer "cannot defeat the inference of a discriminatory motive with one comparator who was treated similarly." *Ondricko v MGM Grand*

*Detroit, LLC*, 689 F3d 642, 652 (CA 6, 2012). The genuine issues of material fact discussed above constitutes evidence from which a jury could reasonable infer that unlawful racial and gender discrimination were motivating factors in Huntington's decision to terminate plaintiff's employment. See *id*. ("Based on these disputed issues of material fact, Ondricko has presented evidence from which a reasonable jury could logically infer that gender was a motivating factor in MGM's decision to terminate her employment.").

Because plaintiff demonstrated that the evidence in this case "when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff," *Hazle*, 464 Mich at 465 (quotation marks and citation omitted), the trial court erred by granting summary disposition in favor of defendants. We therefore reverse.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff having prevailed is entitled to costs. MCR 7.219(A).

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ James Robert Redford

-13-